UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                               :

| | |
|---|---|
| VICTOR MANGUM, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CAROLYN W. COLVIN, Acting | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |
| | : |

------------------------------------------------------X

<div style="border:1px solid black">
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>February 13, 2015</u>
</div>

13 Civ. 4213 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Victor Mangum filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Acting Commissioner of Social Security (the "Commissioner"), denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") based on a finding that Plaintiff was not disabled under the Social Security Act (the "Act"). The parties have cross-moved for judgment on the pleadings. Because the Commissioner's decision is supported by substantial evidence, Defendant's motion is granted, and Plaintiff's motion is denied.

## BACKGROUND[1]

### A.    Plaintiff's Physical Ailments

      Plaintiff, who was born in 1958, applied for DIB and SSI in December 2010. (SSA Rec. 22, 97-106, 118, 139). Plaintiff, who worked as a driver,

---

[1]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #9) filed by the Commissioner as part of her answer. For convenience, Plaintiff's supporting memorandum (Dkt. #12, as amended by Dkt. #13) is

alleges that he became disabled as of July 23, 2010, the date of a motor vehicle accident he sustained while working (the "July 2010 Accident"). (*See id.* at 161, 362, 376). Plaintiff, who was wearing his seatbelt while driving, was "t-boned on [the] passenger side" by another vehicle. (*Id.* at 455). Plaintiff alleges he is disabled due to a herniated disc, asthma, and an enlarged prostate. (*Id.* at 97-108, 123).[2] Plaintiff has also suffered from pain in each of his knees since the July 2010 Accident. (*Id.* at 45, 290, 499).

## B.   Plaintiff's Medical Records

### 1.   Treatment for Asthma

Plaintiff received treatment at the Metropolitan Hospital Center clinic from March 2010 through September 2011 for asthma, allergic rhinitis, and cough. (SSA Rec. 469, 472-504).[3] From March 2010 through February 2011, Plaintiff was treated by Dr. Kiran Shah. (*Id.* at 469, 472-88). Dr. Shah prescribed various medications to alleviate Plaintiff's respiratory issues, including Singulair (*id.* at 477), Prednisone (*id.* at 488), and Albuterol (*id.*). On March 28, 2011, Dr. Olatunji Alese continued to treat Plaintiff for "moderate persistent" asthma and allergic rhinitis. (*Id.* at 489). Dr. Alese noted "clear

---

referred to as "Pl. Br." and Defendant's supporting memorandum (Dkt. #15) as "Def. Br." Plaintiff's opposition to Defendant's motion (Dkt. #23) is referred to as "Pl. Opp." and Defendant's opposition to Plaintiff's motion (Dkt. #22) as "Def. Opp."

[2]     Although Plaintiff's initial disability application listed his enlarged prostate as contributing to his disability, the record does not suggest — and Plaintiff does not argue — that this condition imposes any functional limitations on Plaintiff.

[3]     Allergic rhinitis, more "commonly called hay fever or seasonal allergy," has among its symptoms runny nose, sneezing, and watery eyes. Allergic Rhinitis, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000813.htm (last visited Feb. 13, 2015).

breath sounds, no wheezes, good bilateral airflow." (*Id.*).  On April 25, 2011,
Dr. Oana Cristina Badescu examined Plaintiff, repeating her colleague's
observation of "clear breath sounds, no wheezes, good bilateral airflow," and
characterizing Plaintiff's condition as "mild persistent" asthma and "allergic
rhinitis." (*Id.* at 499-500).  Dr. Badescu also noted that Plaintiff "uses
[Albuterol] more often than before, sometimes even daily." (*Id.* at 500).  Plaintiff
reported no emergency room visits for asthma.  (*Id.* at 50, 138).

### 2.    Treatment for Knee Pain

Plaintiff had surgery on one of his knees in the mid-1980s.  (SSA
Rec. 370).  It is unclear, however, whether doctors operated on his left or right
knee, and the record contains conflicting accounts.  (*Compare id.* at 522
("Surgery on his right knee for a sports injury in 1985."), *id.* at 523 ("A
postoperative scar is noted at the right knee."), *and id.* at 592 ("The patient is
status post right knee surgery in 1985."), *with id.* at 55 ("He had … orthoscopic
surgery on his left knee."), *id.* at 162 ("In 1983 or 1984, he was hospitalized …
for left knee surgery[.]"), *id.* at 359 ("[H]e had surgery performed on his left knee
in 1984[.]"), *id.* at 370 ("He had surgery in his left knee sometime between 1983
and 1986."), *and id.* at 376 ("Past medical history is significant for … left knee
arthroscopy[.]")).  Regardless, after the July 2010 Accident, the record is clear
that Plaintiff began to complain of pain in his *left* knee.  (*See id.* at 167-74,
290, 292, 324-28, 337-53, 362, 410, 510, 514, 520, 531, 536).  Plaintiff

attended physical therapy sessions, but was not prescribed medication in connection with his left knee pain.  (*See id.* at 167-74, 324-28, 362).[4]

In early 2011, Plaintiff underwent nerve conduction studies, which he alleges caused an injury to his right knee.  (*See* SSA Rec. 370, 436-37, 489).[5] After this procedure, Plaintiff reported pain and swelling when seen by doctors. (*See id.* at 376, 428, 436-37, 442, 612).  Plaintiff's pain was partially relieved by taking Advil, and he received no further treatment for his right knee pain.  (*See id.* at 45, 321, 612).

### 3.    Treatment for Back Pain

The most prominent of Plaintiff's ailments — and the ailment at the crux of his disability claim — is the back pain he attributes to the July 2010 Accident.  Following the accident, Plaintiff reported feeling "jittery," but was "ambulatory at [the] scene" of the accident.  (SSA Rec. 455).  He reported "pain in lower right belly and in low back immediately after accident, but pain resolved" afterwards.  (*Id.*).  Plaintiff received treatment at Jacobi Medical Center in the Bronx, New York.  (*Id.* at 451-55).  He "denie[d] any head, neck or back pain."  (*Id.* at 453).  Medical staff noted his "chief complaint" was that he

---

[4]    Although Plaintiff received a prescription for Celebrex in September 2010 (SSA Rec. 355), this medication was prescribed to treat Plaintiff's back pain (*see id.* at 354-55).

[5]    It is unclear precisely how Plaintiff's knee was injured during this procedure.  Some of the doctors who later evaluated Plaintiff infer that Plaintiff received an electromyography ("EMG"), a diagnostic nerve test which entails the probing of muscular tissue with a needle.  (*See* SSA Rec. 370, 373, 436-37, 489).  However, this inference is refuted by Plaintiff's own testimony and the report of the doctor that administered the nerve conduction studies.  (*Id.* at 56 ("I refused a ... needle in my leg."); *id.* at 312 (noting that "patient refused EMG testing")).

was "all shaken up." (*Id.*).  He was diagnosed with "musculoskeletal tenderness," and discharged the same day.  (*Id.* at 451-52).

On August 2, 2010, Plaintiff began physical treatment for his back and knee pain with West Coast Physical Therapy.  (SSA Rec. 167).  Plaintiff reported "on and off pain" in his lumbar spine and "throbbing pain" in his left knee. (*Id.*).  Plaintiff was treated with electric stimulation, therapeutic exercise, and heat.  (*Id.* at 168).  Plaintiff continued his physical therapy sessions, two to three times per week, through August 29, 2011.  (*Id.* at 167-92).

On the same day he began physical therapy, Plaintiff visited Peter Morgan, a chiropractor, for treatment of his back and knee injuries.  (SSA Rec. 510).  Plaintiff reported severe left knee pain, low back pain that radiated down into his left leg, and moderate pain in his "mid back."  (*Id.*).  Plaintiff reported that he had difficulty walking, standing, driving, and performing normal daily activities.  (*Id.*).  Dr. Morgan noted that Plaintiff walked with an altered and guarded gait.  (*Id.*).

On August 4, 2010, upon a referral from Dr. Morgan, Plaintiff received treatment from Dr. Emilio Salazar, M.D.  (SSA Rec. 290).  Dr. Salazar's clinical impression was "[l]eft knee sprain" and "[l]umbar radiculopathy."  (*Id.* at 292).[6]

On August 12, 2010, Dr. Morgan conducted a nerve conduction study. (SSA Rec. 210).  Plaintiff reported low back pain and stiffness, and the test

---

[6]     Radiculopathy is "[a] nerve root injury … sometimes referred to as a 'pinched' nerve." Cervical Radiculopathy (Pinched Nerve), American Academy of Orthopaedic Surgeons, OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited Feb. 13, 2015).

revealed lumbar radiculopathy, disc herniation, and decreased range of motion in the lumbar spine.  (*Id.*).

On August 17, 2010, Plaintiff underwent an x-ray and magnetic resonance imaging ("MRI") exam of his lumbar and thoracic spine.  (SSA Rec. 213-16).  The x-ray of the thoracic spine revealed disc space narrowing in the upper and mid thoracic spine.  (*Id.* at 213).  The x-ray of the lumbar spine revealed straightening of the lordotic curve consistent with musculospasm.  (*Id.* at 214).  The MRI of the thoracic spine, reviewed by Dr. Satish Chandra, M.D., revealed disc herniation, radiculopathy, and disc desiccation throughout.  (*Id.* at 216.  The MRI of the lumbar spine revealed disc herniation, radiculopathy, straightening of the lumbar spine, fluid in the facet joint indicating acute facet inflammation at L4-L5, and a disc bulge at L5-S1.  (*Id.* at 215).

On September 15, 2010, Dr. Salazar performed a physical examination and reviewed the MRI results.  (SSA Rec. 297).  Dr. Salazar noted that the pain in Plaintiff's mid and lower back was improving with physical therapy and chiropractic adjustments.  (*Id.*).  Dr. Salazar further noted "no limitation in range of motion."  (*Id.*).  With respect to Plaintiff's MRI results, Dr. Salazar reported "disc herniation at T7-8 and levoscoliosis [i.e., leftward curvature]" of the cervical spine, and "facet inflammation at L5-S1" of the lumbar spine.  (*Id.*).

On September 27, 2010, Plaintiff visited Dr. Richard Seldes, M.D., for an orthopedic consultation.  (SSA Rec. 354).  Dr. Seldes performed a physical examination, and noted a clinical impression of "T-spine disc herniation" and "Lumbosacral spine disc bulge."  (*Id.*).  Dr. Seldes also noted pain and spasm

upon palpation. (*Id.*).  Dr. Seldes diagnosed a disc herniation in the thoracic spine and disc bulge in the lumbosacral spine (*id.*), and prescribed Celebrex for pain (*id.* at 355).

On October 4, 2010, Plaintiff presented to Chester Bogdan, a chiropractor, for an independent chiropractic examination in connection with a Workers' Compensation claim that he submitted after the July 2010 Accident. (SSA Rec. 358).  Dr. Bogdan reviewed Plaintiff's medical records and performed a physical examination.  (*Id.* at 359).  Plaintiff complained of pain in his middle and lower back and occasional tingling in his hands.  (*Id.*).  Plaintiff was found to have a decreased range of motion in his cervical and lumbar spine, and palpation of the thoracic and lumbosacral spine revealed spasms of the paraspinal muscles.  (*Id.*).  Dr. Bogdan's impression was that Plaintiff "sustained a cervical, thoracic, and lumbosacral spin sprain-strain."  (*Id.* at 360).  He added that Plaintiff "may perform his usual daily activities and full occupational duties with no restrictions."  (*Id.*).

Plaintiff continued chiropractic treatments with Dr. Morgan approximately twice per week from October 28, 2010, through April of 2011. (SSA Rec. 228-47, 408, 541-49, 564-71, 573-91, 603-09).  On December 1, 2010, Dr. Morgan noted that palpation of the thoracic and lumbar spine revealed moderate inflammatory changes around the paraspinal muscles.  (*Id.* at 234).  His report listed the following conditions: disc herniation; disc bulge; traumatic sacral, thoracic, and lumbar myalgia and myofascitis; posttraumatic vertebral subluxation complex in the thoracic, sacral, and lumbar spine; and a

left knee injury.  (*Id.* at 238).  Dr. Morgan prescribed chiropractic spinal adjustments, physical and massage therapy, heat and ice therapy, a cervical and lumbar spine traction-posture pump, an orthopedic support pillow, and orthopedic back support.  (*Id.* at 238-39).

In addition to this chiropractic treatment, Plaintiff continued to receive medical treatment from Dr. Salazar in late 2010 and early 2011.  On November 3, 2010, Dr. Salazar noted "no limitation" in range of motion and that the pain was "significantly improved."  (*Id.* at 300).  Two months later, on January 5, 2011, Dr. Salazar reiterated that Plaintiff's back pain was improving and that he had "no limitation" in range of motion.  (*Id.* at 303).

On January 11, 2011, Plaintiff visited Dr. Leo Varriale, M.D., for an independent orthopedic evaluation in connection with his Workers' Compensation claim.  (SSA Rec. 362).  Dr. Varriale reviewed Plaintiff's medical records and performed a physical examination.  (*Id.* at 363).  Plaintiff complained of low back pain with pain radiating down the left leg, as well as pain in the left knee.  (*Id.* at 362).  Examination revealed spasm and tenderness in the lower back and a decreased range of motion.  (*Id.* at 363).  Dr. Varriale diagnosed lumbar radiculopathy and recommended epidural injections.  (*Id.*).  Regarding Plaintiff's ability to work, and in connection with Plaintiff's Workers' Compensation claim, Dr. Varriale opined that he was "totally disabled."  (*Id.* at 364).  On January 20, 2011, Dr. Varriale issued an addendum to his evaluation, in which he opined that Plaintiff "cannot sit or stand for short periods of time and cannot do any lifting."  (*Id.* at 367).  Regarding activities of

8

daily living, Dr. Varriale opined that Plaintiff could not lift, push or pull, or stand for a long period of time. (*Id.*).

Plaintiff's visits with Dr. Salazar continued through the spring. On February 16, 2011, Dr. Salazar noted that Plaintiff had "limited" range of motion and "is still in pain[,] but does not want a steroid injection." (*Id.* at 308).

On February 18, 2011, Plaintiff visited Dr. Norma Bilbool, M.D., for "nerve conduction studies." (SSA Rec. 311). The results from these studies were "within normal limits," but Dr. Bilbool noted that the "electrical findings are suggestive of bilateral lumbosacral radiculopathy at the S1 root level." (*Id.* at 312). According to Dr. Bilbool's report, Plaintiff "refused EMG testing." (*Id.*).

On February 25, 2011, Plaintiff appeared for a consultative examination with Dr. Susie Chow, D.O. (SSA Rec. 161). Plaintiff walked with a normal gait, but stated that he could not walk on the heels and toes of his left leg because of lower back pain. (*Id.* at 163). Plaintiff displayed a normal stance, and could squat to 40 degrees. (*Id.*). Plaintiff required no help changing for the examination or getting on and off the examination table. (*Id.*). He could also rise from a chair without difficulty. (*Id.*). Dr. Chow observed full flexion, extension, lateral flexion, and rotatory movement bilaterally of the cervical spine. (*Id.* at 164). The thoracic spine showed no scoliosis, kyphosis, or abnormality. (*Id.*).

Dr. Chow's examination of the lumbar spine revealed flexion to 40 degrees, eliciting complaints of mid-to-lower right-sided back pain. (SSA

Rec. 164).  Dr. Chow observed no spasms upon palpation.  (*Id.*).  Plaintiff showed a full range of bilateral motion for the shoulders, elbows, forearms, wrists, hips, knees, and ankles.  (*Id.*).  Plaintiff's joints appeared stable and non-tender with no redness, heat, swelling, or effusion.  (*Id.*).  Plaintiff retained almost full strength (rated at four out of five) in the left leg, full strength in the right leg, and full strength in both upper extremities.  (*Id.*).  Dr. Chow observed no muscle atrophy.  (*Id.*).

Dr. Chow further opined that Plaintiff had no restriction with regard to sitting, standing, walking, or climbing stairs.  (SSA Rec. 165).  She stated that Plaintiff had a mild restriction for bending, pushing, pulling, lifting, or carrying (*Id.*).

Plaintiff returned to Dr. Salazar for a follow-up appointment on March 16, 2011.  (SSA Rec. 315).  Dr. Salazar noted that physical therapy was helping to alleviate Plaintiff's pain, and that Plaintiff showed "no limitation in range of motion."  (*Id.*).

On March 31, 2011, Plaintiff visited a third chiropractor, Richard Romano, for an independent chiropractic evaluation.  (SSA Rec. 369).  Plaintiff reported intermittent symptoms in the lower and mid back that occur with prolonged standing, strenuous activity, and bending.  (*Id.* at 370).  Upon examination, Dr. Romano noted that Plaintiff ambulated with an "antalgic gait" protecting his right lower extremity, wore a lumbar brace, and had some

difficulties getting on and off the examination table.  (*Id.* at 372).[7]  Palpation of the lumbar spine revealed spasm.  (*Id.*).  Dr. Romano noted focal tenderness in the lower thoracic spine and lumbar spine.  (*Id.*).  Dr. Romano diagnosed myofascial pain in the lumbar thoracic region and lumbar radiculopathy.  (*Id.* at 373).  Dr. Romano opined that Plaintiff had moderate to marked impairment in his lumbar and thoracic spine, and Plaintiff should be limited to sedentary activities.  (*Id.*).

Dr. Paul Kleinman, M.D., examined Plaintiff on April 11, 2011, in connection with the latter's Workers' Compensation claim.  (SSA Rec. 376).  Dr. Kleinman's examination showed a limited range of motion, right knee tenderness, and weakness in all muscle groups in the right lower extremity secondary to right knee pain.  (*Id.* at 377).  Dr. Kleinman found low back strain with MRI evidence of a bulging disc.  (*Id.*).  Dr. Kleinman opined that Plaintiff had "[m]oderate partial disability, and is capable of full time sedentary work if he is allowed frequent changes in position."  (*Id.* at 378).  Dr. Kleinman further opined that Plaintiff should not do any repetitive bending or lifting of more than 10 pounds, or any prolonged driving.  (*Id.* at 378).  Dr. Kleinman recommended epidural injections and that Plaintiff should be monitored by his treating physician every two months for the next six months.  (*Id.* at 378).[8]

---

[7]     An antalgic gait is defined as "a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side." http://www.medilexicon.com/medicaldictionary.php? t=35907 (last visited Feb. 13, 2015).

[8]     Dr. Kleinman testified regarding his opinion at a deposition held in connection with Plaintiff's Workers' Compensation claim, and again opined that Plaintiff should be

Plaintiff returned to Dr. Salazar for follow up appointments on May 4, 2011, and July 6, 2011. (SSA Rec. 318, 321). In May 2011, Plaintiff still complained of pain in the lower back. (*Id.* at 318). Dr. Salazar observed "no limitation in range of motion." (*Id.*). In July 2011, Plaintiff complained of pain "in the right knee with partial relief from taking Advil" and Dr. Salazar noted "limited range of motion of the right leg." (*Id.* at 321). Dr. Salazar's July 2011 report is silent with respect to Plaintiff's back pain. (*Id.*).

## C.    Social Security Administrative Proceedings

Plaintiff filed concurrent applications for DBI and SSI benefits on December 20, 2010, alleging disability since July 23, 2010. (SSA Rec. 97-106). Plaintiff's application was denied by the Social Security Administration ("SSA") on March 30, 2011. (*Id.* at 26).

At Plaintiff's request, a hearing was held before ALJ Kenneth G. Levin on February 23, 2012 (the "SSA Hearing"), at which Plaintiff and his counsel were present. (SSA Rec. 37-70). On February 28, 2012, the ALJ issued a decision finding that Plaintiff was not disabled. (*Id.* at 31). The decision became final on April 19, 2013, when the Appeals Council denied Plaintiff's request for review. (*Id.* at 1).

In his decision, the ALJ first determined whether Plaintiff was engaged in substantial gainful activity, and noted that "'[s]ubstantial work activity' is work activity that involves doing significant physical or mental activities," while

---

limited to sedentary work, and that he could do some aspects of his former job, but not driving. (SSA Rec. 389, 391).

12

"'[g]ainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized." (SSA Rec. 23 (citing 20 C.F.R. §§ 404.1572(a)-(b), 416.972(a)-(b))).[9] If an individual is engaged in substantial gainful activity, he is deemed not disabled. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a). The ALJ determined that Plaintiff had not been engaged in substantial gainful activity since July 23, 2010, the alleged onset date of the disability. (SSA Rec. 30).

Having determined that Plaintiff was not engaged in substantial gainful activity, the ALJ proceeded to step two of the analysis. The ALJ assessed whether Plaintiff had a medically determinable impairment that was "severe" or a combination of impairments that was "severe." 20 C.F.R. §§ 404.1520(c). 415.920(c). "An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to

---

[9]     The SSA employs a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled[.]"); *id.* § 416.920(a) (same). The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [him *per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (citing *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

13

perform basic work activities." (SSA Rec. 23).  Conversely, "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work."  (*Id.* (citing 20 C.F.R. §§ 404.1521, 416,921, and Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p)).  If a claimant does not have either a severe medically determinable impairment or a combination of impairments, he is not disabled.  (*Id.*).

The ALJ determined that Plaintiff has had the following severe impairments since July 23, 2010: "mild intermittent asthma, and chronic lower back pain (associated with an accident, chronic lumbosacral strain, and moderate obesity)."  (SSA Rec. 30).  The ALJ found no other severe impairments (*id.* at 29), and noted only "a very temporary problem with his knee" (*id.* at 28).  The ALJ then moved on to the third step of the analysis, to determine "whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of impairment listed in 20 CFR Part 404, Subpart P, Appendix 1."  (SSA Rec. 23 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)).  The ALJ determined that Plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (*Id.* at 30).  In making this determination, the ALJ noted that Plaintiff's "[e]xperienced counsel does not

claim that Mr. Mangum has any Listings-level impairment, anyway." (*Id.* at 29).

The ALJ then proceeded to evaluate Plaintiff's residual functional capacity ("RFC").  After considering the evidence, the ALJ determined that Plaintiff's "records do not support a diagnosis of any medically-determinable musculoskeletal impairment that could reasonably be expected either to explain his back symptoms, or to limit his ability to perform work-related activities." (SSA Rec. 28).  Nonetheless, assuming a qualifying impairment, the ALJ found that Plaintiff "has the residual functional capacity to perform work at the light exertional level, except he should avoid work around strong environmental irritants (e.g., dust, fumes, chemicals, and extremes of temperature)." (*Id.* at 30).

In reaching this determination, the ALJ considered (i) Plaintiff's testimony during the hearing; (ii) the reports of Plaintiff's treating physicians; (iii) the reports of independent medical examiners ("IMEs") — medical doctors and chiropractors — who evaluated Plaintiff in connection with his DBI and SSI applications, and his Workers' Compensation claim; and (iv) the opinion of Dr. Charles Plotz, a doctor who examined Plaintiff's records and testified as an expert witness at the SSA Hearing.  (*Id.* at 24-39).  Finally, the ALJ considered the credibility of Plaintiff's subjective complaints in light of the objective medical evidence.

Beginning with Plaintiff's testimony regarding his subjective complaints, the ALJ noted that Plaintiff rated his pain during the hearing at a "seven-and-

a-half" out of 10, but that he never took medication stronger than aspirin for pain relief.  (SSA Rec. 24).  The ALJ observed "that although claimant leaned to one side or the other during some of the hearing, he did not appear to be in anything like the high level of pain he claimed to be having" and that he "walked with a normal gait and without any assistive device."  (*Id.*).  With respect to Plaintiff's knee pain, the ALJ noted that Plaintiff said he periodically has pain in both knees, but he has had no treatment for this condition since July 23, 2010.  (*Id.*).[10]  With respect to Plaintiff's asthma, the ALJ observed that "doctors classify his asthma as moderate or mild and persistent, but … he rarely if ever requires emergency treatment for it, and most of the time it seems to be well controlled."  (SSA Rec. 26).  And with respect to Plaintiff's back pain, the ALJ noted that Dr. Salazar — Plaintiff's treating physician — "consistently records unremarkable clinical examinations, although he regularly rates the claimant as '100%' disabled."  (*Id.*).

In terms of Plaintiff's daily activities, the ALJ noted Plaintiff's testimony about driving frequently: Plaintiff testified that he drove to General Equivalency Diploma ("G.E.D.") classes on a daily basis, where he attended three hours of class per day (SSA Rec. 25), and that he also drove approximately 90 blocks to church every Sunday (*id.* at 26).

Turning to the IMEs, the ALJ noted that "almost all the IMEs conclude that this claimant is relatively dysfunctional and has a sedentary or less

---

[10]     The Court notes that some of Plaintiff's physical therapy records make note of his knee injury.  (*See, e.g.*, SSA Rec. 186).  However, Plaintiff testified that he did not receive treatment for his knee pain.  (*Id.* at 45).

functional capacity." (SSA Rec. 27; *but see id.* (noting that chiropractor Dr. Bogdan observed "no resulting disability"); *id.* at 28 (noting Dr. Chow as another exception, as she found Plaintiff's "capacity for sitting, standing and walking … unrestricted")). However, the ALJ found the opinions of two of the IMEs — chiropractor Romano and medical doctor Kleinman — to be of little utility to the determination of long-term disability because they evaluated Plaintiff directly after he sustained a temporary injury to his right knee during nerve conduction studies. (*See id.* at 28). *See also* Background Sec. B(2), *infra.* With respect to the conclusions of Dr. Varriale, the ALJ noted that these were "quite at variance with the findings and conclusions of Mr. Mangum's only treating *medical* doctor" and "not consistent with any of the other examining findings." (SSA Rec. 28 (emphasis in original)).

The ALJ agreed with the opinions of Dr. Plotz, who provided expert medical testimony at the SSA Hearing. Specifically, the ALJ agreed with Dr. Plotz that: (i) given the absence of neurological deficits, Plaintiff's thoracic disc herniation "would not be expected to have functional consequences"; (ii) Plaintiff's lumbosacral MRI was "essentially normal"; (iii) the February 2011 nerve conduction test results should be discounted because an EMG was never administered; and (iv) chiropractic test results could be discounted as having "no medical significance." (SSA Rec. 28).

The ALJ also made a detailed finding with respect to the credibility of Plaintiff's subjective complaints in light of the objective medical evidence. Specifically, the ALJ observed that Plaintiff

17

> attempted to minimize some facts that tend to undercut his complaints at least as to degree. For instance, he badly understated the amount of driving he does, until confronted with his own contradictory testimony[.] He said he could sit for no more than 10-15 minutes without moving around, but he managed much more than that at the hearing. As far as I could observe, he overstated the degree of his pain at the hearing, as well.

(SSA Rec. 29). In light of those credibility findings, the ALJ noted he

> could easily adopt Dr. Plotz's view that [medical] records do not adequately demonstrate … any medically-determinable musculoskeletal impairment that could reasonable explain his subjective complaints, and thus that he has no medical reason to be functionally limited in exertional activities. However, I will give him the benefit of the doubt, … and conclude that because of a chronic lumbosacral strain and moderate obesity, he does have a reason to be limited to light exertional activity.

(*Id.*). The ALJ further found that because of Plaintiff's asthma, "he also should not work around strong environmental irritants." (*Id.*).

At step four, the ALJ compared Plaintiff's RFC to his relevant work history. (SSA Rec. 29). Because Plaintiff's past relevant work as a driver entailed work that is "exertionally medium," the ALJ determined that Plaintiff was unable to perform his past relevant work. (*Id.*; *see also id.* at 44 (noting that Plaintiff's past relevant work as a bus or van driver required him to "be able to lift 50 to 75 pounds")).

At step five, the ALJ determined whether there was other work that Plaintiff could perform. (SSA Rec. 24). At the SSA Hearing, the ALJ consulted a vocational expert ("VE") to determine whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and

18

residual functional capacity.  (*Id.* at 30; *see also id.* at 65-70 (testimony of VE)).

In his opinion, the ALJ noted that the VE testified that an individual with

Plaintiff's specific qualifications and limitations would be able to perform the

requirements of representative occupations, such as (i) light-level assembly

jobs, of which there were 750,000 jobs in the national economy, and 4,000 jobs

in the local economy; (ii) retail price marker, of which there were 200,000 jobs

in the national economy, and 3,000 jobs in the local economy; (iii) chauffeur, of

which there were 175,000 jobs in the national economy, and 2,000 jobs in the

local economy;[11] and (iv) mail clerk, of which there were 300,000 jobs in the

national economy, and 3,000 in the local economy.  (*Id.* at 30).

   The ALJ noted that counsel for Plaintiff had modified the ALJ's

hypothetical and asked the VE to limit the jobs to those not requiring repetitive

bending or repetitive lifting of over 10 pounds — a limitation the ALJ did not

deem necessary.  (SSA Rec. 30).  The ALJ noted that the assembly jobs and

chauffeur jobs would still remain even with this added restriction in place, and

that the VE supplied three additional jobs that would comport with Plaintiff's

proposed modifications to the hypothetical: (i) ticket taker, of which there were

75,000 jobs in the national economy, and 4,000 in the local economy; (ii) ticket

---

[11]   The Court notes that it is somewhat counterintuitive that Plaintiff was deemed unable to perform his past work as a bus or van driver, but assumed capable of performing work as a chauffeur.  However, this seeming incongruence has to do with the difference in the physical demands — other than driving — required by these particular jobs. Specifically, Plaintiff's prior job, which required him to lift between 50 and 75 pounds occasionally, is classified as a "medium exertional level" job (SSA Rec. 25, 65), while the job of chauffeur, which requires an ability to lift 10 pounds frequently and 20 pounds occasionally, is classified as "light" (*id.* at 65-68).

seller, of which there were 200,000 jobs in the national economy, and 2,000

jobs in the local economy; and (iii) locker room attendant, of which there were

60,000 jobs in the national economy, and 2,500 jobs in the local economy.  (*Id.*

at 30).  Because the ALJ found that there were jobs that existed in significant

numbers in the national economy that Plaintiff could perform, he arrived at a

finding of "not disabled" under the Act.  (*Id.* at 31).

## D.     The Instant Litigation

Plaintiff initiated this action on June 18, 2013.  (Dkt. #2).  The

Commissioner filed the Administrative Record and her Answer on December

20, 2013.  (Dkt. #8, 9).  The parties proceeded thereafter to file competing

motions for judgment on the pleadings: Plaintiff filed his motion on February 7,

2014 (Dkt. #11-13); the Commissioner filed her motion on July 2, 2014 (Dkt.

#14-15); the Commissioner filed an opposition to the Plaintiff's motion on June

20, 2014 (Dkt. #22); and the motions were fully briefed upon receipt of

Plaintiff's opposition on June 27, 2014 (Dkt. #23).

## DISCUSSION

## A.     Applicable Law

### 1.     Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings

are closed — but early enough not to delay trial — a party may move for

judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a

motion for judgment on the pleadings is the same as that used for a motion to

dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d

147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

### 2.    Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his inability "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than" 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Lewis* v. *Colvin*, 548 F. App'x 675, 677 n.3 (2d Cir. 2013) (summary order) (citing 42 U.S.C. § 1382c(a)(3)(A)); *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (citing 42 U.S.C. § 423(d)(1)(A)).  The claimant must also establish that the impairment is "of such severity that [the claimant]

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian*, 708 F.3d at 417 ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (citing *Talavera*, 697 F.3d at 145)); *see also id.* ("If there is substantial evidence to support the determination, it must be upheld.").  More than that, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  To make this determination — whether the agency's finding were supported by substantial evidence — "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences drawn from the facts.  *See, e.g., Carballo ex rel. Cortes* v. *Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

**B.    The ALJ's Decision Is Supported by Substantial Evidence**

Given these standards, there is no basis to overturn the Commissioner's decision.  A careful review of the record confirms that the ALJ's decision was based on the correct legal standard and supported by substantial evidence.

The ALJ correctly identified the two issues for his determination: (i) whether Plaintiff was disabled under Sections 216(i), 223(d), and 1614(a)(3)(A) of the Act; and (ii) whether Plaintiff's status requirements of Sections 216(i) and 223 were met.  (SSA Rec. 22).  As to the latter issue, the ALJ found that Plaintiff's earnings record showed that he had acquired sufficient quarters of coverage to remain insured through December 31, 2015.

(*Id.*).  There is no reason to doubt the accuracy of this determination, and the parties do not dispute it.

Proceeding to the primary issue — whether Plaintiff was disabled — the ALJ applied the correct legal standard by employing the five-step evaluation mandated under the regulations.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(b).  The ALJ conducted a meticulous review of Plaintiff's testimony, his medical records, and the opinions of his treating and consultative physicians and chiropractors.  Further, the ALJ's determination was supported by substantial evidence, in the form of the reports of Dr. Salazar and Dr. Chow, and the opinion and testimony of Dr. Plotz.  Plaintiff objects, however, that the ALJ's decision was not supported by substantial evidence, and raises three challenges to his determinations, each of which is discussed below.

### 1.   Substantial Evidence Supports the ALJ's RFC Determination

First, Plaintiff argues that the RFC determination that he is capable of performing light work is not supported by substantial evidence.  (Pl. Opp. 1-3).[12]  The crux of Plaintiff's argument is that the ALJ reached this determination only by engaging in "selective evaluation of the medical evidence," and ignoring the findings of some medical providers in favor of others.  (*Id.* at 2; *see also* Pl. Br. 13-15).  The Court disagrees.

---

[12]    "Light work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours."  *Mancuso* v. *Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) (summary order) (citation omitted).

The ALJ considered the entirety of the record, and took care to document why he afforded less weight to the opinions of certain medical providers.  With respect to the chiropractic test results, the ALJ noted — and Dr. Plotz agreed — that these had "no medical significance."  (SSA Rec. 28).  *See Diaz* v. *Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) ("[A] chiropractor's opinion is *not* a medical opinion." (emphasis in original)); *see also* 20 C.F.R. §§ 404.1502, 404.1503, 404.1527 (not listing chiropractors among acceptable treating medical sources whose opinion was entitled to deference).  He further explained why the reports of Dr. Romano, Dr. Kleinman, and Dr. Varriale were not particularly indicative of Plaintiff's long-term function, as Plaintiff had recently suffered a knee injury unrelated to his long-term disability claim.  (SSA Rec. 28 ("[C]laimant has not proven that he had anything besides a very temporary problem with his knee so those … opinions … are of very limited utility in these proceedings, given that claimant has not established that he has any medically-determinable impairment of either knee causing symptoms or functional limitations for anything like the required duration period.")).  With respect to Dr. Bilbool's nerve conduction studies, the ALJ agreed with Dr. Plotz that her finding of "bilateral lumbosacral radiculopathy" should be discounted based on the lack of a confirming EMG and for the independent reason that it was internally inconsistent with her conclusion that "nerve conduction studies were within normal limits."  (*Id.* at 27-28).[13]

---

[13]     Furthermore, as Defendant notes (Def. Br. 19; Def. Opp. 4), the characterization of Plaintiff as "disabled" by medical providers for purposes of his Workers' Compensation claim is not particularly useful in the Social Security context because the two statutory

While the ALJ accorded a great deal of weight to the opinions of treating physician Dr. Salazar and non-treating physicians Dr. Chow and Dr. Plotz — ultimately deciding that their opinions supported the finding that Plaintiff could perform light work — he also considered evidence supporting the Plaintiff's claims.  (*See* SSA Rec. 28 (considering the reports of chiropractor Romano and medical doctors Kleinman, Varriale, and Bilbool)).  *Cf. Sutherland* v. *Barnhart*, 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004) ("Although the ALJ found no objective basis for the plaintiff's complaints about long-term neck and back pain, he never mentioned his weighing of numerous instances in the transcript in which there is evidence to the contrary.  Factual determinations, based on the weighing of evidence, are within the ALJ's competence; however, in making these determinations, the ALJ must address the evidence on the record.  Here, the ALJ's failure to mention several parts of the record which contradict his conclusion constitutes error.").

A careful review of the record reveals substantial evidence that supports the ALJ's RFC finding.  As a preliminary matter, it is significant that the ALJ's determination that Plaintiff could perform light work is supported by the report

---

schemes have completely different definitions of disability.  *See Flanigan* v. *Colvin*, 21 F. Supp. 3d 285, 308 & n.27 (S.D.N.Y. 2014) (collecting cases); *Simmons* v. *Colvin*, No. 13 Civ. 1724 (KBF), 2014 WL 104811, at *7 n.5 (S.D.N.Y. Jan. 8, 2014) ("'[T]he standards which regulate workers' compensation relief are different from the requirements which govern the award of disability insurance benefits under the Act,' and 'an opinion rendered for purposes of workers' compensation is not binding on the [Commissioner].'" (quoting *Rosado* v. *Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994))).  For example, in the Workers' Compensation context, a claimant can receive benefits upon a finding of "partial" disability.  *See DeJesus* v. *Chater*, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995) ("The issue is whether a person is disabled as that term is defined under the Social Security Act, not whether a person is 'disabled' or 'partially disabled' for purposes of workers' compensation.").

of Dr. Salazar — Plaintiff's treating physician.  *See Schisler* v. *Sullivan*, 3 F.3d

563, 567 (2d Cir. 1993) ("[T]he opinions of treating physicians are accorded

more weight than those of non-treating physicians."); *accord Petrie* v. *Astrue*,

412 F. App'x 401, 405 (2d Cir. 2011) (summary order).  Dr. Salazar noted, in

August and September 2010, that Plaintiff's range of motion was "within

normal limits." (SSA Rec. 291, 297).  In November 2010, Dr. Salazar noted "no

limitation" in range of motion and that the pain was "significantly improved."

(*Id.* at 300).  In January 2011, Dr. Salazar reiterated that Plaintiff's back pain

was improving and that he had no limitation in range of motion.  (*Id.* at 303).

In February 2011, Dr. Salazar noted that Plaintiff had "limited" range of motion

and "is still in pain but does not want a steroid injection."  (*Id.* at 308).  And

while Dr. Salazar's February 2011 report may be indicative of a slight setback,

Dr. Chow, who also examined Plaintiff in February 2011, opined as to "no

restriction to sitting, standing, walking, or climbing stairs" and only a "mild

restriction to bending, pushing, pulling, lifting, or carrying."  (*Id.* at 165).

Thus, even assuming *arguendo* a somewhat worsened condition in February

2011, these evaluations of limited restriction in movement fully support a

finding that Plaintiff could perform "light work."  *Lewis*, 548 F. App'x at 677

("[T]he ALJ's determination that [claimant] could perform 'light work' is

supported by [the doctor's] assessment of 'mild limitations for prolonged sitting,

standing, and walking.'").  More to the point, Dr. Salazar's examinations in

March and May 2011 revealed no limitation as to Plaintiff's range of motion;

indeed, his examination in July 2011 is completely silent with respect to back

27

pain or symptoms.  (SSA Rec. 315, 318, 321).  The opinions of Dr. Salazar were appropriately accorded a great deal of weight, and they constitute substantial evidence supporting the ALJ's determination.

The RFC determination is further supported by evidence in the record regarding Plaintiff's daily activity.  Plaintiff testified that he attended classes each weekday for three hours, that he drove to class on each of these days, and that he also drove to church every Sunday.  (SSA Rec. 43, 52).

Finally, the ALJ's determination is supported by the opinion of Dr. Plotz. Dr. Plotz opined that there was no medically-determinable impairment that accounted for Plaintiff's subjective complaint of lower back pain.  (SSA Rec. 60-61).  When asked to reconcile his conclusion with the findings of several IMEs who rated Plaintiff's exertional level at sedentary, he could not.  (*Id.* at 65).

In sum, considering the record as a whole, the Court finds substantial evidence that supports the ALJ's conclusion regarding Plaintiff's RFC to perform "light work."

### 2.    Substantial Evidence Supports the ALJ's Credibility Determination

Plaintiff argues that the ALJ improperly dismissed Plaintiff's subjective complaints of pain because the ALJ considered (i) Plaintiff's appearance and demeanor during the SSA Hearing; (ii) the relatively low amount of Plaintiff's Workers' Compensation award; and (iii) the lack of medication prescribed and taken to manage the pain.  (Pl. Br. 15-17).  The Court disagrees, and finds that substantial evidence supports the ALJ's credibility determination.

28

As an initial matter, the ALJ was not *required* to assess Plaintiff's credibility because of his finding that "claimant's records do not support a diagnosis of any medically-determinable musculoskeletal impairment that could reasonably be expected either to explain his back symptoms, or to limit his ability to perform work-related activities." (SSA Rec. 29). *See Genier* v. *Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("[T]he ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability." (internal citations omitted) (emphasis in original)); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) ("If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.").  This finding was supported by substantial evidence, including, *inter alia*, the reports of Dr. Salazar and Dr. Chow, and Dr. Plotz's testimony that "he c[ould not] really account for [Plaintiff's] low back pain" because "mid-dorsal herniated discs in the absence of neurological findings, don't usually cause any symptoms." (*Id.* at 55; *see also id.* 60-61 (finding no medically-determinable impairment that accounted for Plaintiff's subjective complaint of lower back pain)).  Because the ALJ made this finding, he was not required to proceed further to evaluate the credibility of Plaintiff's subjective complaints,

and "any challenges to the ALJ's analysis and ultimate decision regarding plaintiff's credibility are not grounds for remand." *Knight* v. *Astrue*, No. 10 Civ. 5301 (BMC), 2011 WL 4073603, at *12 (E.D.N.Y. Sept. 13, 2011); *see also Impala* v. *Astrue*, No. 10 Civ. 505 (VLB), 2011 WL 2456356, at *5 (D. Conn. June 15, 2011) ("to the extent a credibility assessment was improper, it was harmless because it did not affect the outcome," where "the ALJ determined that the plaintiff did not have any medically determinable impairments"), *aff'd*, 477 F. App'x 856 (2d Cir. 2012) (summary order); *cf. Meadors* v. *Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (summary order) (remanding for further proceedings where the ALJ failed to "consider the threshold question of whether [claimant] had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges" and "[i]nstead,… proceeded directly to considering the credibility of her subjective allegations of pain" (internal quotation marks and citation omitted)).[14]

Nonetheless, the Court shall address Plaintiff's arguments regarding the specific errors he asserts the ALJ made in evaluating his credibility. With

---

[14] The Court is well aware that an ALJ who does not make an express, threshold finding that no "medically-determinable … impairment … could reasonably be expected either to explain [the] symptoms, or to limit [the] ability to perform work-related activities" (SSA Rec. 28) is required to engage in further analysis. *See Meadors*, 370 F. App'x at 183-84. Specifically, an ALJ under such circumstances is required to "evaluate the intensity and persistence of th[e] symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Id.* at 183 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *Taylor* v. *Barnhart*, 83 F. App'x 347, 350-51 (2d Cir. 2003) (summary order))). The Court need not belabor this point, however: The ALJ here made the requisite, threshold finding; moreover, neither party argues that the ALJ's credibility determination was flawed because he should have considered the seven specific factors enumerated in 20 C.F.R. § 404.1529(c)(3).

respect to Plaintiff's first challenge, the Court finds nothing improper about the ALJ's observations regarding Plaintiff's ability to walk with a normal gait (SSA Rec. 24) and sit for extended periods of time (*id.* at 25).  *See Schaal* v. *Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (acknowledging that ALJ may "take account of a claimant's physical demeanor in weighing the credibility of her testimony as to physical disability"); *accord Gates* v. *Astrue*, 338 F. App'x 46, 49 (2d Cir. 2009) (summary order).  "Although such observations should be assigned only 'limited weight,' there is no *per se* legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility."  *Schaal*, 134 F.3d at 502.  The ALJ's observations constituted one of several factors he considered in reaching the determination that Plaintiff's subjective complaints were not credible.  Thus, even had the issue of Plaintiff's credibility been necessary to the ALJ's decision, the Court would find no error here.

Next, Plaintiff takes issue with the ALJ's references to the Plaintiff's Workers' Compensation claim, specifically with statements like: "His Workers' Compensation carrier also seems to think rather little of his claim, given the extremely low payments he has received up to now."  (SSA Rec. 29; *see also id.* at 25 ("I had noticed — and counsel confirmed — that Mr. Magnum's only lump-sum payment of Workers Compensation insurance to date has been $7722 which counsel agreed is a very low sum.")).  Just as it would be inappropriate for the ALJ reflexively to adopt disability findings made in the Workers' Compensation context, *see* n.13, *supra*, so too would it be inappropriate for the ALJ to discern credibility determinations from Plaintiff's

Workers' Compensation proceedings.  But that is not what the ALJ did here.
Rather, each observation regarding Plaintiff's Workers' Compensation claim "is
mere dicta and is stated in a tone that implies it was intended as an aside and
not as an alternative basis for denying benefits." *Sanderson* v. *Astrue*, No. 08
Civ. 1177 (GTS) (VEB), 2011 WL 1113856, at *11 (N.D.N.Y. Jan. 19, 2011),
*report and recommendation adopted*, 2011 WL 1113805 (N.D.N.Y. Mar. 24,
2011).  In sum, despite several references to Plaintiff's Workers' Compensation
claim, there is no indication that the ALJ abdicated his responsibility to make
his own credibility determination in favor of what he perceived to be the
determination of the Workers' Compensation Board.

Finally, Plaintiff argues that the ALJ erred in taking into account the lack
of medication Plaintiff needed to take to manage his pain.  (Pl. Opp. 16-17).
Again, to the extent the ALJ took lack of medication into account in finding not
credible Plaintiff's subjective complaints regarding pain that usually rated at a
"nine and ten" (SSA Rec. 46) out of 10, the Court observes no error.  The Court
notes that Plaintiff was prescribed medication, Celebrex, to treat pain in
September 2010.  (*Id.* at 355).  But this appears to have been a one-time
prescription, and one that Plaintiff never filled.  (*Id.* at 47).  In subsequent visits
with medical providers, and during the SSA Hearing, Plaintiff repeatedly
reported that he took no prescription pain medication, but occasionally took
over-the-counter pain medication.  (*Id.* at 47-48, 161-62, 290, 362, 429, 499-
500).  Contrary to Plaintiff's assertion (Pl. Br. 17), the ALJ did not consider
medication in isolation from other types of treatment; he expressly

acknowledged that Plaintiff utilized a home electric stimulator and back brace, and that he attended physical therapy (SSA Rec. 24, 26).  Accordingly, the Court finds Plaintiff's arguments unpersuasive, and finds that the ALJ's determination regarding Plaintiff's subjective complaints — while unnecessary — to be supported by substantial evidence.[15]

### 3. Substantial Evidence Supports the ALJ's Determination That There Were a Significant Number of Jobs in the National Economy that Plaintiff Could Perform

Finally, Plaintiff argues that the ALJ erred at step five in the analysis by relying on the testimony of a VE, and that the VE based her testimony upon an incomplete and inaccurate hypothetical question.  (Pl. Br. 11, 17-18).  Once again, the Court disagrees.

"Where significant nonexertional impairments are present at the fifth step in the disability analysis,… the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Rosa* v. *Callahan*, 168 F.3d 72, 82 (2d Cir. 1999) (internal quotation marks and citation omitted).  Plaintiff had asthma, which is a qualifying nonexertional impairment.  *Tirado* v. *Bowen*, 842 F.2d 595, 596-97 (2d Cir. 1988).  The ALJ's reliance on a VE's testimony was therefore wholly appropriate.

---

[15]    As the ALJ noted, having found no impairment that could reasonably explain Plaintiff's subjective complaints, the ALJ could have found "that [Plaintiff] has no medical reason to be functionally limited in exertional activities" rather than finding that he should "be limited to light exertional activity."  (SSA Rec. 29).  Neither party argues, however, that the ALJ should have found Plaintiff capable of performing moderate or heavy work.

Next, Plaintiff argues that the VE's testimony was based on an inaccurate or incomplete hypothetical question. A review of the SSA Hearing transcript belies this argument. The ALJ's initial question to the VE posited a claimant who could "lift[] and carry[] no more than twenty pounds occasionally, and ten pounds frequently," but who also needed to avoid "strong environmental irritants" due to Plaintiff's asthma. (SSA Rec. 66). The VE responded with four jobs existing in the national and local economy that Plaintiff was capable of performing. (*Id.* at 66-67).

Even if this initial question were flawed, any error was rectified through the questioning by Plaintiff's counsel during the SSA Hearing. Significantly, Plaintiff's counsel asked the VE to restrict her hypothetical further to a claimant "with the restriction of no repetitive bending or lifting more than 10 pounds." (SSA Rec. 67). The VE determined that two of the four jobs initially identified, the chauffeur and assembly job, would still be available to such an individual. (*Id.*). Furthermore, the ALJ asked the VE to identify additional jobs that fit the increased restrictions posed by Plaintiff's counsel at the SSA Hearing. (*Id.* at 69). The VE provided the ALJ with three additional jobs that would meet the very restrictions posed by Plaintiff's hypothetical. (*Id.*). In sum, the hypothetical questions posed by the ALJ and Plaintiff's counsel, and the answers provided by the VE, were more than adequate to allow the ALJ to make the requisite step-five conclusion.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed;

Defendant's motion for judgment on the pleadings is GRANTED; and Plaintiff's

motion for judgment on the pleadings is DENIED.  Plaintiff's related motion to

amend or correct his supporting memorandum of law is GRANTED.  The Clerk

of Court is directed to terminate the motions pending at Docket Entries 11, 13

and 14, and to close this case.

SO ORDERED.

Dated:       February 13, 2015
             New York, New York

_____
             KATHERINE POLK FAILLA
             United States District Judge